**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
MERLE WATSON,                   )
                                )
          Plaintiff,            )
                                )
     v.                         )     Civil Action No. 02-980 (GK)
                                )
DISTRICT OF COLUMBIA, et al.,   )
                                )
          Defendants.           )
_____)
```

## MEMORANDUM OPINION

Plaintiff Merle Watson brings this action alleging violations of his Fourth, Fifth and Eighth Amendment rights under 42 U.S.C. § 1983 and various common law violations.[1]  Defendants are the District of Columbia (the "District"); Odie Washington, then-Director of the District of Columbia Department of Corrections ("Corrections"); Harold Jones, Legal Instruments Examiner at the District of Columbia Central Detention Facility; Elwood York, Records Office Administrator at the District of Columbia Central Detention Facility; and Leona Bennett, Associate Warden of Programs at the District of Columbia Central Detention Facility.[2]

---

[1] Plaintiff alleges the common law claims of negligence, gross negligence, false imprisonment and intentional infliction of emotional distress.

[2] On October 4, 2004, Plaintiff voluntarily dismissed his 42 U.S.C. § 1983 claims against Washington, Jones, York and Bennett. See Docket No. 66.  Those Defendants, sued in their individual capacities, are collectively referred to herein as the "individual Defendants."

This matter is now before the Court on Defendants' Motion for Summary Judgment.  Upon consideration of the Motion, Opposition, Reply, and the entire record herein, and for the reasons stated below, Defendants' Motion for Summary Judgment is **granted in part** and **denied in part.**

## I.    BACKGROUND[3]

In 1981, Plaintiff was convicted in the Superior Court of the District of Columbia of manslaughter, carrying a pistol without a license, and a bail violation.  See Def.s' Statement of Material Facts, ¶ 37.  He received a 9-27 year prison sentence for those crimes.  See id. ¶ 38.

On January 31, 2000, Plaintiff was paroled.  See id. ¶ 39.  On July 15, 2000, he was arrested and charged with Possession with Intent to Distribute Marijuana (D.C. Superior Court case No. M-8105-00).  See id. ¶ 40.  Plaintiff was in the custody of Corrections from July 15, 2000 until July 20, 2000, when he escaped from a halfway house.  See id. ¶ 41.

---

[3] Unless otherwise indicated, the facts set forth herein are taken from the undisputed facts presented in the parties' Statements of Material Facts.  See Local Rule 7.1(h), which requires both parties to identify with particularity those material facts necessary to support their motions for or in opposition to summary judgment.

On August 1, 2000, the District of Columbia Board of Parole ("Parole Board") issued a parole violator warrant for his arrest.[4] See id. ¶ 42.

On or about August 23, 2000, Plaintiff was re-arrested and held at the D.C. Jail on D.C. Superior Court case Nos. F-5173-00 (Escape), M-8105-00 (Possession with Intent to Distribute Marijuana) and F-5169-00 (Carrying a Dangerous Weapon). Upon his re-arrest, the D.C. Superior Court ordered him held without bond in each of his three pending criminal cases. See id. ¶ 46. Plaintiff was returned to the custody of Corrections. See id.

On August 26, 2000, the United States Marshals Service lodged a Detainer Based on a Federal Parole Violator Warrant ("Detainer") with the D.C. Jail, advising that the U.S. Parole Commission had issued a parole violator warrant against Plaintiff. See id. ¶ 47. The Detainer was based on the three D.C. Superior Court criminal charges, supra. On September 21, 2000, the United States Marshals Service lodged a second, duplicate Detainer against Plaintiff. See id. ¶ 48. It was also based on the three D.C. Superior Court criminal charges, supra.

On October 12, 2000, D.C. Superior Court case No. F-5169-00 was dismissed. See id. ¶ 49. On October 13, 2000, D.C. Superior

---

[4] On August 5, 2000, pursuant to the National Capital Revitalization and Self-Government Improvement Act of 1997, Pub. L. 105-33, 111 Stat. 712 (1997), now codified at D.C. Code § 24-132 (2004), Congress transferred the authority of the Parole Board to the United States Parole Commission ("U.S. Parole Commission").

Court case No. M-8105-00 was dismissed.  <u>See id.</u> ¶ 50.  On November

17, 2000, D.C. Superior Court case No. F-5173-00 was dismissed.

<u>See id.</u> ¶ 51.  Thus, as of November 17, 2000, all of the pending

criminal charges against Plaintiff had been dismissed.

On November 17, 2000, Harold Jones, a Legal Instruments

Examiner at the District of Columbia Central Detention Facility,

processed Plaintiff's release order in D.C. Superior Court case No.

F-5173-00.  <u>See id.</u> ¶ 52.  "At that time, Mr. Jones was aware that

he had the responsibility to post the release order in the jail's

automated management system ('JACCS'), and to update the release on

plaintiff's 'face sheet,' a document in an inmate's institutional

file that lists the inmate's criminal cases.  In addition, Mr.

Jones was aware that he had a responsibility to check whether the

inmate was being held on any other pending cases and if the inmate

had been released on all pending cases and remained held only on a

parole violator warrant, then to initiate action so that the U.S.

Marshals Service would be notified."  Def.s' Mot. at 3 (internal

citations omitted).  Defendants concede that "[w]hile Mr. Jones

posted [] plaintiff's release in case F-5173-00 and noted that

plaintiff had one other case holding him, he inadvertently did not

investigate further to learn that the other case was not a pending

case but one for which plaintiff was on parole.  As a result, Mr.

Jones inadvertently failed to initiate notification to the U.S.

Marshals Service that plaintiff was now being held solely on the parole violator warrant."   <u>Id.</u>

Plaintiff claims that he made numerous requests to the U.S. Parole Commission and jail officials over the next year regarding execution of his parole violator warrant, but that all of his requests were ignored.   <u>See</u> Pl.'s Opp'n at 3.   Specifically, he contends that his case manager, Cynthia Jamison-Hackett, "hand carried a request for a copy of the parole warrant to Cheryl Warner of the Record Office."   <u>Id.</u> (internal citations omitted).   He maintains that the Records Office failed to respond to that inquiry.   <u>See id.</u> Plaintiff claims that he then "made an [Inmate Grievance Procedure] request to the Warden, Britton-Jackson on April 12, 2001 for a final disposition of his parole violation warrant-detainer[.]"[5]   <u>Id.</u>   According to Defendants, "[t]he Warden never received an inmate grievance from plaintiff regarding an

---

[5] "The Department of Corrections has an established Inmate Grievance Procedure (IGP), as provided in Department Order 4030.1D (effective May 4, 1992).   Under the IGP, inmates may file formal, written grievances, and the Institution Administrator is directed to respond within fifteen days.   If the inmate is dissatisfied with the Institution Administrator's response to his grievance or the inmate does not receive a response within the required time frame, the inmate may file an appeal first with the Associate Director for Institutions and then the Director of the Department of Corrections.   Pursuant to the general procedure for the processing of inmate grievances at the D.C. Jail, inmates would deposit their grievances in the unit mailbox, which were then brought to the Warden's Office.   The Warden's Office would log each grievance, and the grievances would be directed to particular officials for responding depending on the nature of the grievance."   Def.s' Statement of Material Facts, ¶¶ 62, 63.

alleged failure to execute his parole violator warrant or to receive a timely parole revocation hearing." Def.s' Statement of Material Facts, ¶ 64. Plaintiff alleges that he also "made a written request of his own directly to the Records Office asking for a copy of his detainer and help in getting it executed. He gave it to correctional officer Hubb to be sent by institutional mail." Pl.'s Opp'n at 3. Plaintiff claims that "again he received no response." Id.

Plaintiff does not contest that he never filed an administrative appeal from any denial (including lack of response) of any grievance he claims to have filed regarding an alleged failure to execute his parole violator warrant or to receive a timely parole revocation hearing. See Def.s' Statement of Material Facts, ¶ 65.

On November 2, 2001, Plaintiff, along with other inmates in the Safety Net Program for drug rehabilitation, was moved from Southeast 1 cellblock in the D.C. Jail to North 1 cellblock. The move was necessary because "the jail was undergoing renovation and needed to make room for three hundred inmates due to the closure of Lorton Correctional Complex. The Safety Net Program also had to be housed in a unit separate from all other inmates." Bennett Decl. ¶ 11. Upon their transfer, the Safety Net Program inmates complained that North 1 was "unfit for human habitation." Pl.'s Opp'n at 15. Specifically, the inmates alleged that, among other

things, human feces and urine were on the walls and floors, the units were infested with lice and other vermin, the showers had mold, mildew and fungus, food was on the ceilings and walls, and the cell block smelled and was extremely cold and damp.  See id.

Plaintiff claims that after the inmates had been in North 1 for "a couple days" and "got the lice" and "everybody was scratching and complaining about it and couldn't stop itching," Defendants moved them to the Receiving and Discharge Unit where they were sprayed for lice and provided with new jumpsuits and linens.  Watson Dep. at 198.  Defendants then took them to Southwest 1, where they were kept for a couple of days while North 1 was sprayed for lice, washed down and partially painted.  See id. at 199; Def.s' Mot. at 5.  According to Plaintiff, when they were moved back to North 1, there were no improvements in terms of cleanliness.  See Watson Dep. at 200.  The inmates complained repeatedly, and after approximately one week, were provided with cleaning supplies (including rubber gloves, steel wool, brushes, ammonia and bleach), and cleaned North 1 themselves.  See id. at 208-09.  Plaintiff maintains that while this cleaning improved conditions, "it still didn't solve the sewage water coming from the floor ... or the excessive cold."  Id. at 209-210.

On November 21, 2001, Plaintiff and the other inmates in the Safety Net Program were moved out of North 1.  See Pl.'s Opp'n at 16.  Plaintiff claims that as a result of his time in North 1, he

"suffered from physical injuries in the form [of] extreme cold, dampness from standing water, of getting lice, catching the flu, [and] aggravation to his asthma arising from the cold [] and wet conditions." Id.

That same day, November 21, 2001, Plaintiff filed a petition in this Court for writ of habeas corpus pro se, regarding his continued detention on the parole violator warrant. See Watson v. Gaines, et al., No. 01cv2418 (GK). On November 27, 2001, the day after this Court issued an order to show cause why the writ should not be granted, "the detainer finally was executed." See Watson v. Gaines, et al., No. 01cv2418 (GK), November 18, 2002, Mem. Op. at 1. On November 30, 2001, the U.S. Parole Commission scheduled a probable cause hearing, at which a hearing examiner found probable cause that Plaintiff had committed each of the alleged parole violations. On January 3, 2002, Plaintiff was released from the custody of Corrections and reinstated to parole. According to Defendants, upon releasing Plaintiff, the U.S. Parole Commission credited Plaintiff's sentence for the time he spent in custody on the parole violator warrant. See Def.s' Statement of Material Facts, ¶ 61.

On May 20, 2002, Plaintiff filed the instant action seeking compensatory damages for his "pain and suffering" and punitive damages "as a result of the Defendants' willful and wanton disregard for [his] constitutional rights." Compl. at 14-15. On

-8-

October 15, 2003, he filed a First Amended Complaint which included essentially the same allegations.  In Count I, Plaintiff claims that the "actions and inactions" of all Defendants "both directly and through a pervasive policy of failing to provide funding, staff and supervise and enforce policies and procedures with respect to the operations of the Records Office, classification and case management and processing of release orders and warrants constituted deliberate indifference to Plaintiff's right to be free from cruel and unusual punishment pursuant to the Eighth Amendment[], not to be deprived of his liberty without Due Process of Law in violation of the Fifth Amendment and [to be] free from unreasonable seizure in violation of the Fourth Amendment to the Constitution."  First Am. Compl. ¶ 42.

In Count II, Plaintiff maintains that the "actions and inactions" of the District of Columbia, Washington and Bennett "both directly and through a pervasive policy of failing to provide funding, staff and supervise and enforce policies and procedures with respect to the maintenance of humane conditions and operations of the D.C. Jail constituted deliberate indifference to Plaintiff's right to be free from cruel and unusual punishment pursuant to the Eighth Amendment[], not to be deprived of his liberty without Due Process of Law in violation of the Fifth Amendment to the Constitution."  Id. ¶ 43.  In Count III, Plaintiff asserts the common law claims of negligence, gross negligence, false

-9-

imprisonment and intentional infliction of emotional distress against all Defendants for their "failure to supervise and enforce policies and procedures." Id. ¶ 44.

On August 3, 2004, Defendants filed the instant Motion for Summary Judgment.

## II. STANDARD OF REVIEW

Summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits or declarations, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56. Material facts are those that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The nonmoving party then must "go beyond the pleadings and by [its] own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. See Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987) (nonmoving party has affirmative duty "to provide evidence that would permit a reasonable jury to find" in its favor); Crenshaw v. Georgetown

Univ., 23 F.Supp.2d 11, 15 (D.D.C. 1998) (noting that "adverse party must do more than simply 'show that there is some metaphysical doubt as to the material facts'" (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986))).

In deciding a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  See Washington Post Co. v. United States Dep't of Health and Human Servs., 865 F.2d 320, 325 (D.C. Cir. 1989).  Ultimately, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

## III. ANALYSIS

At the outset, it is necessary to emphasize that Defendants have fundamentally misconstrued one of the primary issues in this case.  Defendants argue that "[w]hile plaintiff contends that he was 'wrongfully incarcerated at the D.C. Department of Corrections,' plaintiff was lawfully detained pursuant to a parole violator warrant issued by the U.S. Parole Commission.  Because plaintiff was lawfully detained, ... the actual substance of plaintiff's complaint is that he did not receive a timely parole

revocation hearing." Def.s' Mot. at 6 (quoting First Am. Compl. ¶ 35).

This argument totally misses the mark. Plaintiff's grievance in this case stems not from an error in the scheduling of his parole revocation hearing, but rather from Defendants' failure to notify the United States Marshals Service that, after his three D.C. Superior Court criminal charges were dismissed, he was being held solely on the parole violator warrant.

Defendants argue that "plaintiff was lawfully detained pursuant to a parole violator warrant issued by the U.S. Parole Commission." Def.s' Mot. at 6. Specifically, they contend that "the Department of Corrections was obligated to keep plaintiff in its custody based on the parole violation warrant and was not permitted to release him unless the [U.S.] Parole Commission ordered his release." Id. at 9. While that may be so, it is not the relevant issue for purposes of the instant Motion.

As Plaintiff correctly points out, "as a matter of law, a [D.C.] Parolee is not in the custody of the U.S. Marshal on behalf of the U.S. Parole Commission until a Detainer is executed and the U.S. Marshall and/or the U.S. Parole Commission is notified and indicates they are assuming custody of the Parolee, in accordance with established Parole Revocation Procedures. ... Accordingly, execution of a parole revocation warrant is the procedure by which the U.S. Parole Commission assumes custody of a parolee." Pl.'s

Opp'n at 5-6.   See Moody v. Daggett, 429 U.S. 78, 89 (1976).

In this case, the detainer was not executed until November 27, 2001.   Thus, it was not until that date that the U.S. Parole Commission assumed custody of Plaintiff and had jurisdiction to schedule a parole revocation hearing.   The gravamen of Plaintiff's grievance is that approximately fourteen months elapsed between November 17, 2000, the date by which his three D.C. Superior Court criminal charges were dismissed, and January 3, 2002, the date he was released, because of Defendants' conceded failure to notify the United States Marshals Service that, after his three D.C. Superior Court criminal charges were dismissed, he was being held solely on the parole violator warrant.

Defendants maintain that "the proper relief for the delay in plaintiff's receipt of a parole revocation hearing would have been a writ of mandamus to compel the [U.S.] Parole Commission to hold the revocation hearing.   Because such judicial remedies were available to plaintiff and because he has received a favorable termination of the parole violation charges, there is no further relief to which he is entitled.   The available judicial remedies already afforded due process."   Def.s' Mot. at 10 (citing Sutherland v. McCall, 709 F.2d 730 (D.C. Cir. 1983)).   Plaintiff, however, is not complaining about an error in the scheduling of his parole revocation hearing.   As already noted, the U.S. Parole Commission did not assume custody of Plaintiff until November 27,

2001.  Therefore, it was without any jurisdiction and could not have scheduled a parole revocation hearing until that time. Plaintiff did the only thing he could have done, under the circumstances: he filed a petition in this Court for a writ of habeas corpus regarding his continued detention on the parole violator warrant.  The filing of that petition produced the appropriate result, i.e., the execution of the detainer, the assumption by the U.S. Parole Commission of jurisdiction, and a decision on Plaintiff's release.

Defendants also argue that, "because plaintiff was serving a valid sentence during the time that he was held on the parole violator warrant, he has no cognizable claim under Section 1983. A demand for any further relief, for his 'wrongful incarceration,' beyond compelling the parole revocation hearing, would necessarily imply the invalidity of his sentence and thus amount to an impermissible collateral attack on his conviction absent proof that the sentence has already been legally invalidated." Def.s' Mot. at 10 (citing Heck v. Humphrey, 512 U.S. 477 (1994)).  As Plaintiff correctly points out, however, he "has not challenged his conviction or his sentence.  His claim herein does not imply that the issuance of the Parole Violation Warrant was wrong, only that he was denied constitutionally mandated procedures which deprived him of liberty without due process.  This is not a claim akin to malicious prosecution as was the case in Heck." Pl.'s Opp'n at 26.

### A.   Defendants Are Not Entitled to Absolute Immunity

Defendants argue that they are <u>all</u> "entitled to absolute immunity for any role they allegedly had in the delayed scheduling of plaintiff's parole revocation hearing." Def.s' Mot. at 15. Specifically, they claim that, "[b]ecause the scheduling of a parole revocation proceeding is part of the adjudicatory process, performed in this case at the direction of the [U.S. Parole Commission], [they] are entitled to absolute immunity to the extent of their involvement in this quasi-judicial function." <u>Id.</u> at 16 (citing <u>Doyle v. Camelot Care Ctrs., Inc.</u>, 305 F.3d 603, 622 (7th Cir. 2002) ("the scheduling of parole hearings constitute[s] a judicial function subject to absolute immunity") (citing <u>Thompson v. Duke</u>, 882 F.2d 1180, 1184-85 (7th Cir. 1989))). <u>See</u> <u>Pate v. United States</u>, 277 F.Supp.2d 1, 8-11 (D.D.C. 2003) (same).

"Where absolute immunity is deemed appropriate, an official is protected from all suits attacking conduct within the scope of the immunity, even if the official is alleged to have acted in bad faith." <u>Gray v. Poole</u>, 243 F.3d 572, 575 (D.C. Cir. 2001) (citing <u>Moore v. Valder</u>, 65 F.3d 189, 194 (D.C. Cir. 1995)).

Absolute immunity "flows not from rank or title or 'location within the Government,' but from the nature of the responsibilities of the individual official." <u>Cleavinger v. Saxner</u>, 474 U.S. 193, 201 (1985) (quoting <u>Butz v. Economou</u>, 438 U.S. 478, 511 (1978)).

Although this form of immunity has traditionally been afforded only to judges, "the [Supreme] Court has extended absolute immunity to certain others who perform functions closely associated with the judicial process."[6] <u>Cleavinger</u>, 474 U.S. at 200.  "Accordingly, the 'touchstone' for the doctrine's applicability has been 'performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights.'" <u>Antoine v. Byers & Anderson, Inc.</u>, 508 U.S. 429, 435-36 (1993) (quoting <u>Burns v. Reed</u>, 500 U.S. 478, 500 (1991)).

In the instant case, it is clear that the "judgments" of Defendants are not "'functional[ly] comparab[le]' to those of judges," that is, they do not "'exercise a discretionary judgment' as a part of their function." <u>Antoine</u>, 508 U.S. at 436 (quoting <u>Imbler</u>, 424 U.S. at 423, n.20).  Rather, their responsibilities were basically administrative.  For example, Jones was responsible for (1) posting Plaintiff's release order in the jail's automated management system ('JACCS'); (2) updating the release on Plaintiff's "face sheet;" (3) checking whether Plaintiff was being held on any other pending cases; and (4) initiating action to notify the United States Marshals Service if he had been released

---

[6] These include, <u>inter alia</u>, hearing examiners employed by administrative agencies, <u>see</u> <u>Butz</u>, 438 U.S. at 513-14; attorneys engaged in activities "intimately associated with the judicial phase of the judicial process," <u>Imbler v. Pachtman</u>, 424 U.S. 409, 430 (1976); and witnesses who testify in judicial proceedings. <u>See</u> <u>Briscoe v. LaHue</u>, 460 U.S. 325, 345-46 (1983).

on all pending cases and remained held only on a parole violator warrant.  <u>See</u> Def.s' Mot. at 3.  These functions clearly do not involve substantial discretion, "a key feature of the tasks sheltered by judicial [i.e., absolute] immunity."  <u>Wagshal v. Foster</u>, 28 F.3d 1249, 1252 (D.C. Cir. 1994).  Nor do they involve, to the slightest degree, the resolution of disputes between parties or the adjudication of private rights, as required in <u>Antoine</u>.

Finally, and most significantly, as discussed <u>supra</u>, Defendants' argument is totally off the mark because, as Plaintiff correctly points out, "Plaintiff's claim is not based on an error in the scheduling of his parole revocation hearing, rather it is based on DOC Officials' failure to take action to ensure that the [U.S.] Parole Commission was notified that all pending criminal charges had been dropped and that [he] was to be released unless the [U.S.] Parole Commission promptly executed the warrant and assumed custody of [him]."  Pl.'s Opp'n at 27.

Accordingly, none of the Defendants in this case are entitled to absolute immunity.

**B.   The District Is Not Entitled to Summary Judgment on Plaintiff's Count I "Wrongful Incarceration" Claim**

In Count I of the First Amended Complaint, Plaintiff claims that all Defendants violated his rights pursuant to the Fourth, Fifth, and Eighth Amendments when they failed to notify the United States Marshals Service that, after his three D.C. Superior Court

criminal charges were dismissed, he was being held solely on the parole violator warrant.  See First Am. Compl. ¶ 42.

Defendants argue that the District is entitled to summary judgment on Plaintiff's Count I "wrongful incarceration" claim for two reasons.  First, they allege that "Plaintiff cannot establish an underlying constitutional violation upon which to base municipal liability."  Def.s' Reply at 9 (citing Baker v. Dist. of Columbia, 326 F.3d 1302, 1306 (D.C. Cir. 2003)).  Second, they contend that, "assuming a predicate constitutional violation, plaintiff fails to establish that a custom or policy of the District of Columbia caused the violation of plaintiff's constitutional rights."[7] Defs.' Mot. at 34 (citing Monell v. Dep't of Social Serv. of the City of New York, 436 U.S. 658, 691 (1978)).

"[I]n considering whether a plaintiff has stated a claim for municipal liability, the district court must conduct a two-step inquiry."  Baker, 326 F.3d at 1306 (internal citation omitted). First, it must determine whether the plaintiff can establish a claim for a predicate constitutional violation.  See id. (internal citation omitted).  Second, if so, then it must determine whether a custom or policy of the municipality caused the violation.  See

---

[7] Defendants also argue that "[t]he individual Defendants -- Washington, York, Bennett and Jones -- are all entitled to qualified immunity with respect to Count I of the Complaint."  Def.s' Mot. at 21.   This argument has become moot because on October 4, 2004, Plaintiff dismissed his 42 U.S.C. § 1983 claims against these Defendants in their individual capacities.   See Docket No. 66.

id. (internal citation omitted).  "Each inquiry is separate and serves different purposes."  Id. (internal citations omitted).

### 1.   Plaintiff has established a predicate Eighth Amendment and Due Process Clause violation

In his First Amended Complaint, Plaintiff alleges three predicate constitutional violations based on his "wrongful incarceration:" (1) an Eighth Amendment violation; (2) a due process violation; and (3) a Fourth Amendment violation.  See First Am. Compl. ¶ 42.  In his Opposition to Defendants' Motion for Summary Judgment, Plaintiff fails to respond to Defendants' argument that he cannot establish a predicate Fourth Amendment violation.  Accordingly, the Court will treat this argument as conceded, and address only Defendants' other arguments that Plaintiff cannot establish a predicate Eighth Amendment and/or Due Process Clause violation upon which to base municipal liability. See United States v. Real Property Identified As: Parcel 03179-005R, 287 F.Supp.2d 45, 61 (D.D.C. 2003) (citing Bancoult v. McNamara, 227 F.Supp.2d 144, 149 (D.D.C. 2002) ("[I]f the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded[.]") (internal citations omitted)), and cases cited therein.

To establish an Eighth Amendment violation, Plaintiff must demonstrate that Defendants acted with "deliberate indifference."

See Estelle v. Gamble, 429 U.S. 97, 104 (1976); Wilson v. Seiter, 501 U.S. 294, 303 (1991); Farmer v. Brennan, 511 U.S. 825, 828 (1994) (internal citations omitted); Baker, 326 F.3d at 1306.  To recover under the Due Process Clause, Plaintiff must establish that Defendants' conduct is conscience-shocking.  Smith v. Dist. of Columbia, -- F.3d --, 2005 WL 1560402 at *5 (D.C. Cir. 2005) (citing Fraternal Order of Police Dep't of Corr. Labor Comm. v. Williams, 375 F.3d 1141, 1145-46 (D.C. Cir. 2004)).

"Deliberate indifference has been demonstrated ... where prison officials were put on notice and then simply refused to investigate a prisoner's claim" that he is entitled to be released. Moore v. Tartler, 986 F.2d 682, 686 (3rd Cir. 1993) (internal citations omitted).  See Davis v. Hall, 375 F.3d 703, 716 (8th Cir. 2004) (same), and cases cited therein; Haygood v. Younger, 769 F.2d 1350, 1355 (9th Cir. 1985) (concluding that the prison officials were deliberately indifferent to Haygood's constitutional rights because they failed to address his credible evidence that he was entitled to release); Alexander v. Perrill, 916 F.2d 1392, 1398 (9th Cir. 1990) (prison officials cannot "stand by idly after an inmate has raised the prospect that he is being unlawfully incarcerated and has provided documentary evidence in support of his claim").  See also Garcia v. City of Chicago, Ill., 24 F.3d 966, 974 (7th Cir. 1994) ("[W]hatever haziness obscures the exact contours of a duty to investigate burns off once the authorities

<u>know</u> that they have no basis for detention.") (emphasis in original).

Plaintiff claims that, following the dismissal of the last of the three pending criminal charges against him on November 17, 2000, he began making requests to the U.S. Parole Commission and jail officials over the next year regarding execution of his parole violator warrant.  According to Plaintiff, all of his requests were ignored until November 28, 2001, when the parole violator warrant was finally executed.  <u>See</u> Pl.'s Opp'n at 3.  Based on the evidence which Plaintiff has presented, a reasonable juror could conclude both that Defendants acted with "deliberate indifference" and that Defendants' "deliberate indifference" will shock the conscience sufficiently to violate due process.

Accordingly, Plaintiff has established a predicate constitutional violation pursuant to both the Eighth Amendment and the Due Process Clause.

### 2. Whether a District custom or policy caused Plaintiff's alleged constitutional injuries are issues for a jury to decide

To succeed on a Section 1983 claim against the District, Plaintiff must allege "an affirmative link, such that a municipal policy was the moving force behind the constitutional violation." <u>Baker</u>, 326 F.3d at 1306 (internal quotations omitted).  Causation would exist if, for instance, the District fails "to respond to a need ... in such a manner as to show 'deliberate indifference' to

the risk that not addressing the need will result in constitutional violations." Baker, 326 F.3d at 1306 (internal citations omitted). "Deliberate indifference is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations, an objective standard." Id. at 1307 (citing Farmer, 511 U.S. at 841).

Plaintiff claims that the District was "advised that there was a history of systemic problems with the Case Management and the Records Office from a report issued in October 1999 by the D.C. Corrections Trustee, John Clark regarding the erroneous release of Leo Gonzales Wright." Pl.'s Opp'n at 11 ("Clark Report"). According to Plaintiff, the Clark Report noted that the "DOC administration should respond expeditiously to the problems in the records office management and implement the recommendations of previous studies in 1985, 1989, 1996 and 1997. Particular attention to the need of the headquarters record office administrator, increased security, and a separate J&C file system should be a priority. Trustee Clark also recommended: The current process DOC has undertaken to thoroughly review and update all written policy in case management and records management needs to be brought to completion and operational staff adequately trained." Id. at 12 (internal citations omitted). Plaintiff claims that "[a]lthough Defendants admit getting the [Clark Report], they

denied it advised them of systemic problems with case management and records office." Id.

Plaintiff also claims that the District was "aware that on July 28, 2000 John Shaw, an independent consultant [operating] pursuant to an order by U.S. District Judge Royce Lamberth, issued a report regarding the D.C. Jail Record Office Operations.  [The District was] on notice that in his report[,] Shaw noted six major studies regarding the DOC Record Office Operations over the past 24 years and concluded that many of the pertinent recommendations had not been followed, including those made by Trustee Clark in the [Clark Report]."  Id. ("Shaw Report").  Plaintiff claims that "Defendants admit they received the [Shaw Report] but deny they knew this information."  Id. at 12.

Based on the evidence which Plaintiff has presented, a reasonable juror could conclude that the District knew or should have known of the risk of constitutional violations.  As such, the District is not entitled to summary judgment on Plaintiff's Count I "wrongful incarceration" claim.[8]

------

[8] Because Plaintiff dismissed his 42 U.S.C. § 1983 claims against the individual Defendants in their individual capacities, see Docket No. 66, they are currently being sued in Count I only in their official capacities.  "Official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent."  Monell, 436 U.S. at 690, n.55. A plaintiff who prevails in an official-capacity suit must look to the government entity as the real party in interest.  See Kentucky v. Graham, 473 U.S. 159, 166 (1985).  Where the governmental entity can itself be held liable for damages as a result of its official
(continued...)

## C.   The District Is Not Entitled to Summary Judgment on Plaintiff's Count II Eighth Amendment Claim

In Count II of the First Amended Complaint, Plaintiff alleges that the District, Washington, and Bennett violated his Eighth Amendment right to be free from cruel and unusual punishment when they confined him in the North 1 cellblock from November 2, 2001 until November 21, 2001.  See First Am. Compl. ¶ 43.  Defendants argue that the District is entitled to summary judgment on Plaintiff's Count II Eighth Amendment claim for two reasons. First, they allege that "Plaintiff's evidence is insufficient to show that the conditions of his confinement [in November 2001] violated the Eighth Amendment."  Def.s' Mot. at 35.  See Baker, 326 F.3d at 1306.  Second, they contend that, "[e]ven assuming arguendo such a constitutional violation, plaintiff once again fails to show that an unconstitutional municipal policy or custom was the moving

---

        [8](...continued)
policy, a suit naming the government officials in their official capacity is redundant.  See id. at 166-67 & n.14; Atchison v. Dist. of Columbia, 73 F.3d 418, 424 (D.C. Cir. 1996).

        In Count I, the claimed injuries are allegedly the result of District policy or custom, i.e., the failure "to provide funding, staff and supervise and enforce policies and procedures with respect to the operations of the Records Office, classification and case management and processing of release orders and warrants[.]" First Am. Compl. ¶ 42.   Therefore, Plaintiff's Count I claims against the individual Defendants in their official capacity are, in reality, claims against the District itself.  Since Plaintiff has named both the individual Defendants and the District as Defendants, Plaintiff's official-capacity Count I claims against the individual Defendants must be dismissed as duplicative.  Count I, therefore, remains only against the District.

force behind his alleged constitutional violation."[9]  Def.s' Mot. at 42 (citing Monell, 436 U.S. at 691).

### 1.  Plaintiff has established a predicate Eighth Amendment violation

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."  U.S. Const. Amend. VIII.  When evaluating claims for cruel and unusual punishment, courts make a two-part inquiry: (1) whether the defendants acted with a sufficiently culpable state of mind (the "subjective component"), and (2) whether, in light of "contemporary standards of decency," the alleged deprivation was sufficiently serious to rise to the level of a constitutional violation (the "objective component").  See Wilson, 501 U.S. at 298.

The subjective component is satisfied by showing "deliberate indifference" by prison officials.  Id. at 303.  See Estelle, 429 U.S. at 105 ("deliberate indifference to a prisoner's serious illness or injury" violates the Eighth Amendment).  "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  Farmer, 511 U.S. at 835.  See Whitley v. Albers, 475 U.S. 312, 319

---

[9] Defendants also argue that "Director Washington and Leona Bennett are entitled to qualified immunity on plaintiff's 'conditions of confinement' claim."  Def.s' Mot. at 41.  Again, this argument has become moot because on October 4, 2004, Plaintiff dismissed his 42 U.S.C. § 1983 claims against these Defendants in their individual capacities.  See Docket No. 66.

(1986) ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock."). To constitute cruel and unusual punishment, conduct "must involve more than ordinary lack of due care for the prisoner's safety; mere negligence will not suffice." Morgan v. Dist. of Columbia, 824 F.2d 1049, 1057 (D.C. Cir. 1987) (citing Whitley, 475 U.S. at 319).

In this case, Defendants argue that they were not deliberately indifferent because they made "consistent effort[s]" to address the various problems in North 1. Def.s' Mot. at 40. Plaintiff claims, however, that Defendants moved him to North 1 even though they knew the unit to be "unfit for human habitation." Pl.'s Opp'n at 48. He also claims that they "intentionally [kept] the temperature low, except when the jail monitor came by to inspect," and "took minimal corrective measures until they were forced to move [him] after weeks of complaints[.]" Id. Based on the evidence which Plaintiff has presented, a reasonable juror could conclude that Defendants acted with "deliberate indifference."

The objective component is satisfied by showing that the conditions of confinement "involve the wanton and unnecessary

infliction of pain" or are "grossly disproportionate to the severity of the crime warranting imprisonment." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). See Caldwell v. Caesar, 150 F.Supp.2d 50, 61 (D.D.C. 2001) ("Conditions of confinement will violate the Eighth Amendment if the deprivation is sufficiently serious, judged objectively, that is, when the prisoner is denied 'the minimal civilized measure of life's necessities.'") (quoting Farmer, 511 U.S. at 834) (quoting Rhodes, 452 U.S. at 347)).

In this case, Defendants argue that "because plaintiff suffered no deprivation of a basic identifiable human need, plaintiff fails to meet the objective component of an Eighth Amendment claim." Def.s' Mot. at 39. Plaintiff claims, however, that "he was subjected to a cellblock that was unfit for human habitation. He assert[s] the cellblock was excessively cold, covered in human feces and urine. He also claim[s] that it was also subject to regular flooding of sewage for several weeks. He also claim[s] that defendant officials knew of this inhumane situation but did not make reasonable efforts to respond to [his] complaints. Moreover, [he] claims that one official misrepresented that conditions had been corrected. [He] also allege[s] [] that he suffered physical pain, emotional distress and mental anguish as associated with the conditions of his incarceration. Moreover, during his deposition by defendants, [he] amplified his claims by describing his physical injuries as suffering from the flu, having

his asthma condition made worse and physical discomfort because of the wet and cold conditions."  Pl.'s Opp'n at 46.  Based on the evidence which Plaintiff has presented, a reasonable juror could conclude that these deprivations are "sufficiently serious" to deny Plaintiff "the minimal civilized measure of life's necessities."

### 2. Whether a District custom or policy caused Plaintiff's alleged constitutional injury is an issue for a jury to decide

As discussed supra, to maintain an action under Section 1983 against the District, Plaintiff must "demonstrate a deprivation of his constitutional rights that was caused by a policy, custom or practice of the District of Columbia, or a single 'municipal decision [that] reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision.'"  McRae v. Olive, 368 F.Supp.2d 91, 95 (D.D.C. 2005) (quoting Bd. of the County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 403 (1997)).

Based on the evidence which Plaintiff has presented, a reasonable juror could conclude that the District knew or should have known of the risk of constitutional violation.  As such, the District is not entitled to summary judgment on Plaintiff's Count II Eighth Amendment claim.[10]

---

[10] Again, for the reasons discussed supra in n.8, Plaintiff's official-capacity Count II claims against the individual Defendants must be dismissed as duplicative.  Count II, therefore, remains only against the District.

**D.    Defendants Are Not Entitled to Summary Judgment on Plaintiff's Common Law Claims (Count III)**

In Count III of the First Amended Complaint, Plaintiff asserts the common law claims of negligence, gross negligence, false imprisonment and intentional infliction of emotional distress against all Defendants for their "failure to supervise and enforce policies and procedures." First Am. Compl. ¶ 44. Defendants argue that they are entitled to summary judgment on Count III because it "sets forth insufficient allegations to establish any common law claims." Def.s' Mot. at 42. Plaintiff, however, incorporates by reference the factual allegations contained in the First Amended Complaint to support his common law claims. See First Am. Compl. ¶ 41. Thus, the Court concludes that Plaintiff has presented sufficient evidence to reach a jury on his common law claims. Accordingly, Defendants are not entitled to summary judgment on Count III.[11]

---

[11] Plaintiff acknowledges that the individual Defendants might be entitled to qualified immunity on these claims. Defendants, however, have not actually asserted the qualified immunity defense. A defendant's qualified immunity is an affirmative defense. See Pate, 277 F.Supp.2d at 7 (citing Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982)). Therefore, the burden of pleading it rests with the defendant under the Federal Rules, which provide that the defendant must plead any "matter constituting an avoidance or affirmative defense." See Gomez v. Toledo, 446 U.S. 635, 640 (1980) (quoting Fed. R. Civ. P. 8(c)). Thus, Plaintiff need not anticipate or respond to a potential qualified immunity defense in his First Amended Complaint. See Gomez, 446 U.S. at 640. If and when Defendants actually assert the qualified immunity defense, the Court will then determine whether Plaintiff can overcome qualified immunity.

**IV.   CONCLUSION**

Accordingly, for the foregoing reasons, Defendants' Motion for Summary Judgment is **granted in part** and **denied in part.**

An Order will issue with this Memorandum Opinion.


_____/s/_____
GLADYS KESSLER
United States District Judge

July 18, 2005